UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO.: |
| v. | : | 3:06-cr-57 (JCH) |
| | : | |
| FRANCISCO RODRIGUEZ | : | OCTOBER 4, 2006 |

**RULING ON DEFENDANT'S MOTIONS TO SUPPRESS [Doc. No. 46]**

**I.     INTRODUCTION**

Defendant Francisco Rodriguez was indicted on four counts of conspiracy to

possess and distribute a controlled substance.  Pending before the court is Rodriguez's

motion to suppress evidence seized during a warrantless search by the government

from his apartment and car.  He also moves to suppress statements he made after his

arrest.  Rodriguez argues that there was no probable cause to arrest him and thus any

consent to search given after the arrest is invalid.

**II.     FINDINGS OF FACT**

The court finds the following facts based on affidavits submitted by the parties

and evidence presented at a hearing held on August 23, 2006.

While acting in an undercover capacity, DEA Task Force Agent and Stamford

Police Officer Felix Martinez met Marino Delossantos at a bar in Norwalk, CT, on

October 19, 2005.  See Transcript of Evidentiary Hearing ("Tr.") at 142-43.  Officer

Martinez and Mr. Delossantos spoke together in Spanish about the possibility of a

future cocaine deal and exchanged phone numbers.  Id.  On October 25, 2005, the two

1

men met again at an Exxon gas station on the corner of Lindley and Capital Avenues in Bridgeport, CT.  Arriving alone and on foot, Delossantos entered Officer Martinez's car, see Tr. at 112.  He told Officer Martinez that he looked familiar and had a suspicion that he was a police officer from Stamford, CT.  Tr. at 145.  At the meeting, Delossantos said that he could "go home" to get a sample of cocaine for Officer Martinez, and they agreed to meet shortly thereafter at the Cumberland Farms store/gas station located just off Exit 24 of I-95 in Fairfield, CT.  Tr. at 145-47.

Agents who had begun to conduct surveillance of Delossantos after the meeting with Officer Martinez saw him walk to a white Dodge Neon.  After the deal was done, agents ran the car's license plate and determined that the car was registered to Valerie Delossantos.  Tr. at 71, 75.  Using databases, agents determined that the last name of this man they knew as "Marino" was Delossantos and concluded that the car was registered to a member of his family, Valerie Delossantos of 13 Jourmire Road in Bridgeport, CT.  Tr. at 75; U.S. Ex. 1, DEA Report, tab A, ¶ 8.

The agents followed Delossantos as he made a brief stop inside Mike's Supermarket at 375 Capitol Avenue in Bridgeport and then drove to 1315 Howard Avenue, a residential building in Bridgeport, where he went inside for a few minutes. Tr. at 71-73.  He came out of that building soon thereafter, and the agents then saw him drive to Cumberland Farms to meet Officer Martinez.  At Cumberland Farms, Delossantos entered the passenger side of Martinez's car and gave him a sample of cocaine, telling him he could also get Martinez some heroin.  Tr. at 74, 76, 149.  At some point during the meeting, Delossantos asked Martinez if he knew two individuals from Stamford, to which Officer Martinez responded that he did not (although in fact he

2

knew them).  Tr. at 149.  As a result, however, the agents became concerned that Delossantos would learn Martinez was a police officer.  The agents therefore decided they would arrest Delossantos at the next meeting.  Tr. at 79, 151.

During the evening of October 25, 2005, Officer Martinez called Delossantos and told him that he wished to buy two ounces of cocaine and five grams of heroin.  Tr. at 150.  The two men agreed to meet the following day at Cumberland Farms between 12:00 p.m. and 1:00 p.m.  Tr. at 151.  The plan was to arrest Delossantos at the gas station in front of Cumberland Farms without giving him a chance to have any further meetings with Officer Martinez.  Tr. at 152.  The transaction that took place over the phone was conducted in "code;" that is, it did not use any words – such as "cocaine," "heroin," "drugs," "narcotics," "ounce," or "gram" – that would directly reveal the subject matter of the conversation.  Tr. at 179-80.  As Officer Martinez testified during the hearing, "a drug dealer will never refer to drug or narcotics on the phone just in case the phone [call is] taped so they wouldn't know."  Tr. at 179-80.

Around 10:15 a.m. on October 26, 2005, DEA Agent Rodney George began surveillance of 1315 Howard Avenue, parking his car about three-quarters of a block away from the residence under surveillance.  Tr. at 81.  According to Agent George's testimony, "it seemed logical" that 1315 Howard Avenue was a multifamily residence, as at least two mailboxes and three doorbells were seen on the front of the building.  Tr. at 103, 117; see also Ex. 21-23.  Upon arrival at the place of surveillance, Agent George saw parked there the same white Dodge Neon that Delossantos had driven the previous day.  Tr. at 80.

Around 10:45 a.m., Agent George observed two men enter the Dodge Neon, one

3

of whom the agent recognized as Delossantos from surveillance the day before.  Tr. at 72, 82.  Agent George did not see the two men exit the house but first saw them coming from the front porch area; neither man appeared to be carrying anything. Tr. at 118-19.  Delossantos entered the car on the passenger side while the other man, whom Agent George later identified as Francisco Rodriguez, entered the driver's seat.[1]  Tr. at 81-83.  George followed the Dodge Neon to Dewey Street, but lost sight of it after he saw it heading towards I-95.  Tr. at 84.

Around 11:15 a.m., Officer Martinez spoke with Delossantos on his cellular telephone, telling him he was ready to meet, but Delossantos told him he needed more time.  Tr. at 154.  Martinez testified that he heard "car sounds" and heard a person other than Delossantos in the background.  Tr. at 154-55.  Around 12:20 p.m., Officer Martinez again called Delossantos, who told him to call him when Martinez got to the agreed-on Cumberland Farms location.  Tr. at 157-58.  Again Officer Martinez testified that he heard "road noise" and that he again thought he heard another person in the background.  Tr. at 158, 183-84.  Upon cross-examination, Officer Martinez stated that he believed Delossantos was in a car, although he acknowledged that the "car sounds" he heard could also be heard if he had been sitting someplace where cars were passing by.  Tr. at 186.

About ten minutes later, around 12:30 p.m., Agent George observed the Dodge Neon come back to 1315 Howard Avenue, to which he had returned after he had earlier lost sight of the car.  Tr. at 88-89.  Delossantos was observed exiting the car on the

---

[1]Agent George testified that he did not recognize Rodriguez the first time he saw him, but every time he saw Delossantos' car on October 26, he saw the same individual (Rodriguez) driving the car.  See Tr. at 83.

4

passenger's side and entering the front door of the residence.  Id.  Agent George also

observed Rodriguez, the driver, getting out of the car and walking around the back of

the car, at which point George lost sight of him.  Tr. at 89.  Approximately ten minutes

later, Delossantos was seen coming out of the house and getting into the passenger

seat of the same Dodge Neon, with Rodriguez again taking the driver's seat.  Tr. at 89-

90.  Delossantos did not carry anything into or out of the house.  Tr. at 123-24.  When

the car drove away with Rodriguez as its driver, the agent followed it on the five minute

drive south on I-95, where the car took the Exit 24 ramp to the nearby gas station at

Cumberland Farms.  Tr. at 90-92.

Officer Martinez called Delossantos around 12:50 p.m. to confirm the meeting

location; Delossantos said he was on his way.  Martinez heard no road noise or voices

in the background during this phone call.  Tr. at 160-61.  After or around the same time,

Officer Martinez learned from Agent George that Delossantos had exited the building

and had entered the passenger's seat of the Dodge Neon.[2]

On the way to Cumberland Farms, Delossantos called Martinez to tell him to

follow his car to another location when he arrived.  Tr. at 161-63.  There is some

question as to the exact words used by Delossantos in Spanish, as Officer Martinez

testified that he was more fluent in spoken than written Spanish.  Officer Martinez

translated the phrases spoken as meaning either, "I don't want to do it there" or "Let's

---

[2]The defendant points out discrepancies in the witnesses' time references, as Officer
Martinez testified he received a phone call from Delossantos around 12:55 p.m. saying he was
on his way, while Agent George testified he observed Delossantos arriving at the apartment
building at 12:30 p.m. and leaving approximately ten minutes later for the five-minute drive to
Cumberland Farms.  See Def.'s Post-Hearing Reply at 3 [Doc. No. 68].  However, the court
does not find this timing discrepancy to be significant for the purpose of finding whether there
was sufficient probable cause to arrest the defendant or of assessing credibility.

go some place else," see Tr. at 181-82, while according to the defendant's translation of

Officer Martinez's spelling of what Delossantos said, the former phrase ("No quiero

estar ahí") should be translated as, "I don't want to be there."  Def.'s Post-Hearing

Memorandum in Support of Motion to Suppress ("Post-Hearing Mem.") at 6 & n.2-3

[Doc. No. 64].  Neither party disputes that, during this phone conversation in the car,

Delossantos never used criminally-explicit words, like "narcotics transaction,"

"transaction," or "deal," that would reveal the subject matter of the conversation.  Tr. at

181-82.  "Let's go some place else" is the most innocent of the translations, but even if

the court found Delossantos said, "I don't want to do it there," it would still be innocuous

to an innocent person in the car.[3]

Officer Martinez had told Delossantos in this last phone call that he was not

going to be in the car but would be inside; he asked Delossantos to wait for him when

he got to Cumberland Farms.[4]  Tr. at 162.  When the Dodge Neon arrived at the

designated location, with Rodriguez as driver and Delossantos as passenger, it pulled

into the gas station at Cumberland Farms.  Agents immediately surrounded the car and

arrested Delossantos and Rodriguez.  Id.  Rodriguez, after being advised of his rights in

Spanish, was asked where he lived.  In English, he stated that he lived on the second

floor of 1315 Howard Avenue, and he then consented to a search of his apartment.

See DEA Agent William Klein Aff. at ¶ 3 [Doc. No. 66-4].

The agents took Rodriguez to 1315 Howard Avenue.  Upon arriving at the

---

[3]During the phone call, Officer Martinez heard Delossantos talking to another person in Spanish, although Martinez could not hear what was being said.  Tr. at 162.

[4]In fact, although Martinez's car was parked at the gas station at Cumberland Farms, the officer himself was sitting about a block away in one of the police vehicles.  Tr. at 165.

second floor apartment, agents found it to be occupied by another person, who told them that the door to Rodriguez's third floor apartment was on the second floor. <u>See</u> DEA Agent William Klein Aff. at ¶7[Doc. No. 66-4]. The agents executing the consent search then asked Rodriguez exactly in which apartment he lived, and Rodriguez pointed to the top floor of the building, stating that he lived "all the way up." <u>See</u> DEA Agent Eileen Dinnan Aff. at ¶ 4 [Doc. No. 66-5]. Drugs were then found in the third floor apartment.

After Delossantos' arrest, he was quickly searched at the scene and drugs were found on him. Tr. at 166. He was then taken to the Bridgeport DEA office. About 25 minutes after the arrest, Agent George interviewed Delossantos after having read him his rights in English and Spanish. Tr. at 106. Early on in the interview, which was held in English, Delossantos stated that he knew Officer Martinez was a police officer. Tr. at 127-28. Without telling Delossantos that Rodriguez had consented to the search of his apartment, Agent George told Delossantos that the arresting agents were on their way to 1315 Howard Avenue to search it, to which Delossantos responded that he shared an apartment on the second floor of that residence with Rodriguez. Tr. at 107, 128-29. Agent George then asked him whether there were drugs there, to which Delossantos responded that drugs were to be found in the kitchen area of the apartment at 1315 Howard Avenue. Tr. at 129. Agent George then called the arresting agents, who told him that they were already at 1315 Howard Avenue and had found drugs there. When George told Delossantos about this discovery, Delossantos admitted that the drugs were his, not Rodriguez's. Tr. at 130. Delossantos did state that Rodriguez was driving him around for his drug transactions, and that Rodriguez knew that Delossantos was

7

engaging in drug dealing.  Tr. at 110.


IV.     DISCUSSION

    A.      **Probable Cause**

Warrantless arrests in public are lawful when law enforcement officers have probable cause to believe the person arrested has committed or is committing a crime. See United States v. Watson, 423 U.S. 411, 417-18 (1976); United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983).  To determine whether probable cause exists, an officer must have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Calamia v. New York, 879 F.2d 1025, 1032 (2d Cir. 1989); see also Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (probable cause for arrest exists when there are "facts and circumstances 'sufficient to warrant a prudent man that the [suspect] had committed or was committing an offense'") (citations omitted).

Probable cause does not require "absolute certainty."  Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003.  Instead, whether it exists is determined by looking at the facts and information available to the officer at the time of the arrest or immediately preceding the arrest.  Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002).  Courts must look at the "totality of circumstances," as probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  Id. (quoting Ill. v. Gates, 462 U.S. 213, 232 (1983).  Thus, as the Supreme Court has explained, to determine whether

there is probable cause to arrest a person, a court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." <u>Maryland v. Pringle</u>, 540 U.S. 366, 371 (2003).  Officers can rely on the reasonable observations and allegations of fellow police officers when making their probable cause determinations**.**  <u>See</u> <u>Panetta v. Crowley</u>, 2006 U.S. App. LEXIS 21293, at *15-16 (2d Cir. 2006) (citations omitted).

The government contends it had "ample probable cause" to arrest Rodriguez, based on their experience that known drug dealers would not have brought an "innocent bystander" along as their driver, and that during their drive from the alleged "stash house" to the transaction's meeting place, Delossantos spoke within earshot of Rodriguez about the arrangements of the drug deal.  <u>See</u> United States' Proposed Findings of Fact in Opposition to Defendant's Motion to Suppress Evidence ("U.S. Findings") at 1, 7-8 [Doc. No. 65].  The defendant counters that, at the time of the arrest the government agents had no probable cause because, at all times that he was observed, Rodriguez did not engage in any suspicious activity, as all he was seen doing was driving Delossantos to and from a residential building.  <u>See</u> Rodriguez's Post-Hearing Mem. at  [Doc. No. 64].

The court agrees with the defendant that the government lacked the requisite probable cause needed for a lawful arrest.  Under the "totality of circumstances," <u>Gates</u>, 462 U.S. at 232, and considering the facts that were available to the government agents at the time of Rodriguez's arrest, this court does not find that they amounted to

9

a "reasonable, objective basis for belief in [Rodriguez's] guilt."  United States v. Webb, 623 F.2d 758, 761 (2d Cir.1980).  It is true that the government agents were well-informed that Delossantos was a drug dealer, but the mere association of a third party with a known drug dealer does not establish probable cause to arrest that third party. See Ybarra v. Illinois, 444 U.S. 85, 91 (1979).  Indeed, several Supreme Court cases support this conclusion, for in each of several cases, a defendant was illegally searched, or arrested and then searched, based upon his mere proximity to suspected illegal activity.  In Ybarra, the defendant was searched because he was in a bar whose bartender was suspected of dealing drugs.  444 U.S. at 88-89.  In United States v. Di Re, the defendant was found in a car with an informant, a known suspect, and visible contraband.  332 U.S. 581, 583 (1948).  In Sibron v. New York, the defendant was observed over the course of eight hours speaking to known drug addicts.  392 U.S. 40, 45 (1968).  The Supreme Court held in each case that a defendant's mere proximity to contraband, suspect individuals, or illegal activity did not give the police probable cause to search or arrest him.  See Ybarra, 444 U.S. at 90-91; Di Re, 332 U.S. at 592-93; Sibron, 392 U.S. at 62-64.  As the Supreme Court explained in Ybarra, "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S.  at 91 (citing Sibron, 392 U.S. at 62-63).  Such a search or seizure "must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be."  Id.

The government argues that the facts of this case are clearly distinguishable from those of Di Re.  See United States' Mem. Opp. at 14 [Doc. No.53].  In the government's view, the distinction is based not only on the fact that the present case involved a drug sale, while Di Re involved gas coupons not obviously counterfeit on their face, but also because Rodriguez was driving Delossantos to and from the suspected drug storage location during the time when Delossantos had agreed to meet Officer Martinez for the sale.  It argues that, therefore, these facts combined, as well as the agents' training and experience involving drug transactions, amounted to ample probable cause.  See id. at 14-15.  However, although it is true that the Supreme Court stated that dealing in counterfeit gas coupons "does not necessarily involve any act visibly criminal," Di Re, 332 U.S. at 593, the government has provided no evidence for this court to conclude that Delossantos' drug transaction involved any acts "visibly criminal" to Rodriguez.  There is no evidence that Rodriguez ever saw Delossantos dealing drugs or saw any drugs in plain view.  At no time when Rodriguez was in the car did Delossantos' words contain language that would make the transaction "visibly criminal" to Rodriguez.  Indeed, this case seems sufficiently similar to Di Re, as here, too, "the argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hideout but in broad daylight, in plain sight of passers-by, in a public street of a large city."  Id.  Here, Delossantos' words were innocuous and the transaction occurred at midday, at a busy gasoline station/convenience store, just off of I-95.

In this case, prior to October 26, 2005, the agents involved in the Delossantos'

11

drug transaction knew nothing about Rodriguez, and in fact they only observed him on

several brief occasions before his arrest.  He was unknown to the police,[5] and there

was no information connecting Rodriguez with the commission of any crime, other than

the fact that he was seen in the presence of a suspected criminal.  It is true that

Rodriguez had been seen in the vicinity of what the government believed to be the

suspected drug storage location.  However, given that "it seemed logical" to the agents

watching the location that 1315 Howard Avenue was a multifamily residence, see Tr. at

103, 117, Rodriguez's presence there cannot necessarily render him suspicious.

    The government relies on the Second Circuit decision in United States v. Fox,

788 F.2d 905 (2d Cir. 1986), where a driver, traveling alone, was arrested after coming

out of a house in which a drug dealer lived.  However, there is no indication that the

house the officers in that case were surveilling, was anything but a single-family house,

see id. at 906, thereby allowing them to reasonably infer that cars stopping briefly at

that house may have been involved in drug transactions.  Here, however, at the time

they arrest Rodriguez, the government did not know in which of the apartments

Delossantos likely stored his drugs.

    Additionally, the fact that Rodriguez was driving Delossantos' car to the drug

_____

    [5]The defendant points to United States v. Bazinet, 462 F.2d 982 (8th Cir. 1972), where
the court found that the police lacked probable cause to arrest the driver of a van in which was
present a person suspected of illegal dynamite trafficking.  The court found that the police did
not know Bazinet at the time of his arrest and arrested him solely because of the suspect's
presence in Bazinet's car.  Although Rodriguez was not entirely "unknown" to the government
when he was arrested, as the agents had seen him on several occasions throughout the day,
they did not have information regarding Rodriguez's involvement in any crime.  See Sibron, 392
U.S. at 63 (finding the police lacked probable cause to arrest where they had no information
concerning the defendant except for having observed him talking to a number of known drug
addicts over a period of eight hours without hearing the contents of these conversations).

transaction does not create sufficient probable cause to arrest him.  There is nothing

inherently suspicious about one person driving another person's car when the police

know nothing about the nature of their relationship.  As such, this fact does not support

an inference that Rodriguez knew about Delossantos' drug activities.  The government

argues further that, in their experience, those who drive to transactions are typically not

"innocent bystanders."  See Tr. at 98, 191.  However, there is nothing to support the

inference that Rodriguez knew he was driving Delossantos to a drug deal.  Indeed, the

fact that Delossantos secreted the drugs on himself is supportive of the conclusion that

Rodriguez was an innocent driver from whom Delossantos wanted to keep the purpose

of the trip secret.  Rodriguez's mere presence in the car with Delossantos does not

"warrant the inference that he was engaged in criminal activity."  Bazinet, 462 F.2d at

988 (citing Di Re, 332 U.S. at 593).

Indeed, in Bazinet, the defendant was arrested for driving the car with Knox, a

known suspect, who was seen exiting the car and reentering it shortly thereafter with a

paper bag that was later discovered to contain various suspicious items.  Id. at 985.

The court held that, despite being the driver of this car, the police lacked probable

cause to arrest Bazinet for no criminal activity was committed by Knox in front of

Bazinet.  Id. at 989.  It rejected the government's argument that the contents of the

paper bag gave probable cause that all of the car's occupants were engaging in illegal

conduct, stating that "[i]f this reason ever gave probable cause with respect to Bazinet,

it was dissipated when [the officer] searched the van initially and found no additional

evidence of criminal activity on Bazinet's part."  Id. at 988.

Unlike in Bazinet, here the agents had never observed Delossantos carrying

13

anything into or out of the car.  Moreover, after the arrest the police only found drugs on Delossantos, not on Rodriguez and not in the car.  The government has also not presented any evidence that Delossantos had any drugs in "plain view" of Rodriguez at any time.  See United States v. Heath, 455 F.3d 52, 57 (2d Cir. 2006) (Part II) (stating that "those who are permitted to observe obvious criminal activity . . . are, absent indications to the contrary, likely to be complicit in the offense").

The fact that Rodriguez was in the car during some of the telephone conversations between Delossantos and Officer Martinez does not render Rodriguez a knowing participant in the drug transaction, for the testimony of Officer Martinez made clear that the transaction that took place over the phone was conducted in "code," without using such words as "cocaine," "drugs," or "transaction."  Tr. at 179-80, 181-82. Thus, that Delossantos held that phone conversation in the presence of Rodriguez does not provide any evidence that Rodriguez knew about or could have known about the arranged drug deal with Officer Martinez.

Moreover, the government's reliance on Maryland v. Pringle, 540 U.S. 366 (2003) is misplaced, because the facts in that case are substantially different from the present one.  In Pringle, the defendant was one of three men found riding in a car containing drugs at 3:16 a.m., and all of the three men had denied ownership of the drugs.  Id. At 367.  The Court held that the arrest was lawful, as the police had found contraband in a common area of a car and the car's occupants all denied ownership. Id. at 374.  In this case, to the contrary, the government agents knew that Delossantos was the party they were looking for, he had the drugs on his person, and there was nothing else in the car that evidenced illegal activity.

14

Under the totality of circumstances, the court finds that the government's arrest of Rodriguez was not based on probable cause that he was involved in the drug transaction, as the agents had no information implicating Rodriguez or showing that he knew or could have known about Delossantos' drug activity, "unless his presence in the car warranted that inference." Di Re, 332 U.S. at 592.  As the Supreme Court has warned, "[p]resumptions of guilt are not lightly to be indulged from mere meetings." Id. at 593.  Thus, arresting Rodriguez merely because he was present in the car with Delossantos was unlawful.

As a result of the court's finding that Rodriguez was illegally arrested, any statements made by Rodriguez after his arrest must be suppressed as the "fruits" of the unlawful arrest.  See Wong Sun v. United States, 371 U.S. 471, 485 (1963) ("[V]erbal evidence which derives so immediately from . . . an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.").  Therefore, the consent given by Rodriguez to search his apartment and car is void.

### B.    Inevitable Discovery

Even if the agents lacked probable cause to arrest Rodriguez, the government argues that they would inevitably have obtained a search warrant for his apartment after Delossantos' arrest and the drugs found at 1315 Howard Avenue would inevitably have been discovered.  Under the "inevitable discovery" doctrine, evidence that was illegally obtained will not be excluded, "if the government can prove that the evidence would have been obtained inevitably" even if there had been no constitutional violation.  Nix v. Williams, 467 U.S. 431, 447 (1984); see also United States v. Eng, 997 F.2d 987, 990

15

(2d Cir. 1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred") (citations omitted).  The government bears the burden of showing inevitable discovery.  <u>Nix</u>, 467 U.S. at 444.

 "In essence, the inevitable discovery doctrine's application turns on a central question:  Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation?  If the answer is 'yes,' the evidence seized will not be excluded."  <u>United States v. Heath</u>, 455 F.3d 52, 55 (2d Cir. 2006) (Part I, dissenting) (Calabresi, J.).  With respect to warrants, the Second Circuit requires a higher standard of probability than under the probable cause determination, for "evidence minimally sufficient to support probable cause would not always be enough to demonstrate that a governmental actor vested with discretion – <u>e.g.</u>, a magistrate judge asked to issue a warrant – would act on that evidence."  <u>Heath</u>, 455 F.3d at 59 (Part III); <u>see also</u> <u>United States v. Cabassa</u>, 62 F.3d 470, 473-74 (2d Cir. 1995).  It is insufficient for the government to show "that it is more probably than not that the disputed evidence would have been obtained without the constitutional violation."  <u>Heath</u>, 455 F.3d at 58 (Part III).  Indeed, "proving that a judge could validly have issued a warrant supported by probable cause [is] not necessarily enough to establish that a judge would have issued the warrant in question."  <u>Id.</u> at 59.  Instead, the government will prevail under the inevitable discovery doctrine only "where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the

contested evidence would be resolved in the government's favor."[6] Id. at 60.  The task

for a district court, therefore, is "'to deny the motion to suppress on the ground of

inevitable discovery only if it has a high level of confidence that the warrant in fact

would have issued and that the specific evidence in question would have been obtained

by lawful means.'"  Id. at 59 (citations omitted).

In Cabassa, DEA agents entered the defendant's home without a warrant and

seized drugs, weapons, and money. See Cabassa, 62 F.3d at 472.  Other DEA agents

had been in the process of requesting a search warrant from a magistrate judge,

although they had not yet obtained one.  Id.  The Second Circuit excluded the evidence

obtained during the illegal search, holding that although the government's draft affidavit

might well have established probable cause, there was "some room for disagreement,"

and thus there was "a residual possibility that a magistrate judge would have required a

stronger showing of probable cause" before authorizing the search.  Id. at 473-74.  The

court found that a detailed showing of each of the contingencies involved required an

analysis of the strength of the government's showing of probable cause, "the extent to

which the warrant process has been completed at the time those seeking the warrant

learn of the search," whether a warrant was "actually obtained" after the illegal entry,

and whether there is any "evidence that law enforcement agents 'jumped the gun'

_____

[6]Even while dissenting from Part III of the Heath opinion, Judge Cabranes appears to
agree that the inevitable discovery standard applied by the majority would apply, as here, in
"cases in which the police have engaged in a warrantless search of property otherwise
unsupported by any exception to the warrant requirement."  455 F.3d at 63 (Cabranes, J.,
dissenting) ("I do not doubt that Cabassa and its progeny set forth a reasonable approach for
those circumstances in which the police have entered into a home without a warrant.  Indeed,
prior cases have indicated that courts view warrantless property searches with suspicion and
thus require a showing that the police had taken tangible steps to ensure that they inevitably
would have obtained a warrant from a neutral and detached magistrate.").

because they lacked confidence in their showing of probable cause." Id. at 473 & n.2.

In the instant case, the critical inquiry is whether the government would have been able to obtain a search warrant for the particular apartment at 1315 Howard Avenue in time for it to find the drugs still there. The government contends that it would have inevitably arrested Rodriguez after finding drugs on Delossantos and learning from him that Rodriguez knowingly participated in the drug trafficking, and that after his arrest Rodriguez would have consented to the search. See U.S. Supplemental ("Suppl.") Mem. at 5-6 [Doc. No. 74]. However, in light of the court's holding above, the court finds that the government could not have arrested Rodriguez at the time drugs were found on Delossantos, for to do so would be to arrest someone merely because he was in the presence of a known drug dealer. See supra at 9-14. Moreover, although the government may have developed probable cause to arrest Rodriguez if and when Delossantos began talking, it would not have been any sooner than twenty-five minutes after he was arrested. Thus, as the court discusses in more detail below, the principal contingency that needs to be addressed is what happened during those first twenty-five minutes: is there a high level of confidence that Delossantos would have talked and, if he had, is there a high level of confidence that a search could have been done at the time the drugs remained in the apartment? Even under the preponderance of the evidence standard, which is the extent of the government's burden under the inevitable discovery doctrine, see Nix, 467 U.S. at 444 n.5, the government must still demonstrate that each of the contingencies would have been

resolved in its favor.  Heath, 455 F.3d at 55.[7]

The government argues that the drugs found at Rodriguez's apartment would inevitably have been discovered as a result of Delossantos' admission after his arrest that more drugs were located at the 1315 Howard Avenue home.  The government claims that, even if Rodriguez had not been arrested, the DEA agents would, as a matter of routine DEA procedure, unquestionably have obtained a search warrant for the premises based on Delossantos' statement and the observations of the agents who were surveilling Delossantos in connection with the drug transaction with Officer Martinez.  See U.S. Suppl. Mem. at 8-9.  Moreover, the government contends that since it took only one minute for the agents to determine that Rodriguez in fact lived in the third floor apartment based on the information provided to them by the second floor tenant, the government would have been able to go back to the magistrate judge to get a warrant for the correct apartment.  It asserts that the combination of Delossantos' confession that he lived on the premises with Rodriguez and that there were more drugs at the apartment would be sufficient probable cause for a magistrate judge to issue a warrant.  See id. at 9-10.

The defense counters that, first of all, the government cannot assume Delossantos would have provided them with the same information had Rodriguez not been arrested and consented to the search of his apartment, and secondly, that the government's investigative techniques would not have linked Delossantos to the third floor apartment.  It points out that Delossantos responded to questions about the

---

[7]In Heath, 455 F.3d at 59 n.6 (Part III), the Second Circuit noted, but did not resolve, the discrepancy between the "paradox of applying the preponderance of the evidence standard in the context of inevitable discovery."

apartment only after he knew that Rodriguez had been arrested and after the police told

him agents were on their way to search it.  Furthermore, it asserts that there were no

names on the mailboxes of the residence, there was no lease in Delossantos' name,

there were no database search results linking Delossantos to 1315 Howard Avenue,

and it was unclear from the agents' account whether the second floor tenant knew

Rodriguez by name or only showed the agents where the door to the third floor

apartment was located.  See Def.'s Suppl. Mem. at 6-8 & n.3.  Thus, if Rodriguez had

not accompanied the agents to the 1315 Howard Avenue residence, he argues that it is

possible they would have never discovered that his apartment was on the third floor.

The court disagrees that the government's investigative techniques would not

have eventually linked Delossantos to the third floor apartment.  However, it agrees that

the government has not proven that Delossantos would have provided the police with

the information about there being more drugs at the 1315 Howard Avenue apartment

and about Rodriguez's involvement.  If Rodriguez had not been arrested and the police

officers had not told Delossantos that agents were on their way to search – a statement

that was based on Rodriguez's consent to the search – there is no way of knowing

whether Delossantos would have made the same confessions to the officers.  In fact,

the court concludes that it would be unlikely for an individual to make such an

incriminating statement when he knows that the person who lives at the apartment in

question – and who knows about the drugs stored there – was free to go home and

thus had the ability to move or destroy the drugs.

The court finds that too much speculation would be required here in order to

apply the inevitable discovery doctrine in the context of Delossantos' statements.  The

decision, United States v. Vasquez De Reyes, 149 F.3d 192 (3d Cir. 1998), addressed the inevitable discovery doctrine as it relates to statements, discussing whether a routine INS investigation of the defendant's marriage would have inevitably discovered the testimonial evidence regarding a sham wedding, evidence that had been obtained as a result of an illegal stop.  Id. at 193-94.  The Third Circuit held that "it requires an unacceptable degree of assumption and speculation to find that the incriminating [testimonial] evidence of marriage fraud would have inevitably been discovered."  Id. at 196.  In addressing the use of the inevitable discovery doctrine in the context of statements, it stated:  "A tangible object is hard evidence, and absent its removal will remain where left until discovered.  In contrast, a statement not yet made is, by its very nature, evanescent and ephemeral.  Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same."  Id.

Thus, as De Reyes makes clear, it is not so easy to conclude, let alone with a "high level of confidence," that Delossantos would have said the same thing to the police that would have given them probable cause to search the particular apartment or to arrest Rodriguez.  This is especially so where the statement at issue is made by a non-law enforcement person, for it is harder to determine what such an individual might have said or done during a police investigation than what law enforcement agents would have done.  As Professor LaFave has explained, there is a distinction between cases that require a "determination not of what law enforcement agents would otherwise have done with what results, but instead what some other person would have done."  6 Wayne R. LaFave, Search and Seizure § 11.4(a), at 282 (4th ed. 2004).

21

Indeed, "'[c]ases that rely upon individual behavior as a crucial link in the inevitable discovery chain, particularly when that behavior is heavily influenced by the illegality that did occur, rarely sustain an inevitable discovery theory." Id. at 283. This court finds that the government has failed to satisfy its burden of proving that Delossantos would have made the same statements if Rodriguez had not been arrested.

If Delossantos did not make the same statements subsequent to his arrest, there would be no probable cause for the police to search a particular apartment at 1315 Howard Avenue. If, however, Delossantos did make the same statements, the court agrees with the government that there would be probable cause for a magistrate judge to issue a warrant for the second floor apartment. For purposes of this portion of the ruling, the court will assume, arguendo, that Delossantos told the police that he lived with Rodriguez on the second floor of 1315 Howard Avenue, that there were drugs there, and that Rodriguez drove him around on drug deals. This information would have been enough to obtain a search warrant, at least for the second floor apartment. Once at the scene, the agents would have encountered the second floor tenant and, based upon his information, would have had enough particularity to go back to a magistrate judge for an amended warrant for the third floor apartment.[8]

Moreover, after Delossantos told the police that Rodriguez was a knowing participant,

---

[8] Unlike defense counsel, the court finds that the DEA report clearly indicates that Collazo, the second floor tenant, "explained that _Rodriguez_ lived on the third floor." See U.S. Ex. 1, DEA Report, tab E, ¶ 4 (emphasis added). The court also finds no basis in defense counsel's claim that Collazo might not have been present at the apartment or provided the police with the same information. Nix states that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification." Nix, 467 U.S. at 444 n.5. Thus the court will assume that, based on the "historical fact" that Collazo in fact pointed the police to Rodriguez's apartment, he would do so again even if Rodriguez had not also consented to the search.

the government would have had probable cause to arrest Rodriguez.  The hurdle that the government cannot overcome is not the fact that the police would *never* have obtained the requisite probable cause, but that it would have taken them at least twenty-five minutes to do so.

In fact, the real uncertainty here, if one assumes, contrary to the court's holding, that Delossantos would have told the agents exactly what he did, is whether the drugs in the apartment might have disappeared before issuance or execution of any warrant. See Cabassa, 62 F.3d at 474.  For purposes of this discussion, even if the court were to assume that it were possible for the government to obtain a warrant within minutes of hearing, again arguendo, from Delossantos that drugs were in the apartment at 1315 Howard Avenue, the critical contingency involves those twenty-five minutes before Delossantos' confession.  Since Rodriguez would not have been arrested, it is possible that he would have found a ride back to the residence at 1315 Howard Avenue,[9] and moved or destroyed the drugs in his apartment or called someone to destroy them before the police would have obtained the probable cause necessary to search the apartment or to arrest him.

The government argues that, even if Rodriguez were to return to his apartment subsequent to Delossantos' arrest, the agents stationed at 1315 Howard Avenue "would have prevented any destruction of evidence and would have been justified in arresting Rodriguez."  U.S. Suppl. Mem. at 11.  They cite Segura v. United States, 468 U.S. 796 (1984), as support.  The court does not agree that Segura stands for the

---

[9]It is about a five minute drive from Cumberland Farms to 1315 Howard Avenue.  See Tr. at 91.

broad proposition that the police could prevent a person from entering his own apartment when they have no probable cause to believe that *the apartment in question* contains evidence of a crime or to believe the person committed a crime. Instead, the Supreme Court in Segura specifically held that, "securing a dwelling, *on the basis of probable cause*, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." Id. at 810 (emphasis added). Segura involved officers who entered the premises *with probable cause* to arrest the occupants, took them into custody, and secured the premises from within "to preserve the status quo" while a search warrant was being obtained. Id. at 798. The Court found that, since a seizure affects only an individual's "possessory interests,"[10] and no privacy interests, warrantless seizures of property are reasonable, provided, however, that "there is probable cause to believe that that property is associated with criminal activity." Id. at 808.[11] The Supreme Court did not, however, review the District Court's holding, affirmed by the Second Circuit, that the seizure of a *person* within the apartment was illegal. Thus, as the Second Circuit later explained, "[p]erhaps the rationale of Segura would permit minimal restraint

_____

[10]In Segura, the defendants whose possessory interest may have been interfered with were under arrest and in police custody throughout the entire time the police seized their apartment. Consequently, the Court stated that the "*actual* interference with their possessory interests in the apartment and its contents was, thus, virtually nonexistent." 468 U.S. at 813 (emphasis added). In the instant case, however, the government wants to use Segura in a context where Rodriguez, whose possessory interests would be interfered with, would not have been arrested and as to him, at that time, there was no probable cause to arrest him.

[11]In a footnote, the Court noted two instances when it has allowed seizures of property and detentions based on less than probable cause. See id. at 806 n.6 (discussing United States v. Van Leeuwen, 397 U.S. 249 (1970) and United States v. Place, 462 U.S. 696 (1983)). However, both of those cases involved seizures of packages or luggage and not of a private dwelling.

upon by-stander occupants of premises to prevent them from destroying evidence or otherwise interfering with a search, but it suggests no general authority to impose detention upon those for whom the Government lacks probable cause to arrest." Ayeni v. Mottola, 35 F.3d 680, 690 n.13 (2d Cir. 1994).

It is true that there is no *per se* bar against the police preventing people from entering a residence; however, such seizure of a dwelling to secure the premises generally requires a showing of probable cause.  See, e.g., Illinois v. McArthur, 531 U.S. 326 (2001) (finding no Fourth Amendment violation where police prevented man from entering his trailer home for two hours while they were getting a search warrant, because temporary seizure was supported by probable cause and was intended to prevent loss of evidence); United States v. Crespo de Llano, 838 F.2d 1006, 1016 (9th Cir. 1987) (securing a dwelling until search warrant is obtained is not unreasonable where probable cause exists to conduct search); United States v. DiCesare, 765 F.2d 890, 898-99 (9th Cir. 1985) (seizure of premises inappropriate where no probable cause to seize or search apartment); see also United States v. Berrett, 513 F.2d 154, 155 (1st Cir. 1975) (no seizure where agents did not exercise "dominion" over defendant's garage or stolen calculators stored there before warrant was executed).

In this case, the government lacked probable cause with respect to a particular apartment.[12]  During the twenty-five minutes between Delossantos' arrest and his

---

[12]In Whitehorn, 829 F.2d at 1231, agents had already "pinpointed" the particular apartment to be searched prior to the illegal search.  That fact, coupled with the fact that the warrant application process was already an hour underway, led the Second Circuit to apply the inevitable discovery doctrine.  Id. ("The agents had overwhelming probable cause, before the [illegal] bomb sweep to search the apartment in the belief that it was being used . . . as a 'safe house' for federal fugitives.").

statements connecting him to 1315 Howard Avenue, the police had no information from which of the three apartments (or other part of the building) Delossantos may have obtained or stored the drugs.  The agents conducting the surveillance only saw him come out of the multi-family residence, but they could not observe which apartment or area of the structure he had visited.  Without probable cause as to a particular place, the case law does not support their securing the entire premises without having any idea as to which apartment was the one in which they wanted to prevent evidence from being destroyed.

Furthermore, when the agents would see Rodriguez arrive at 1315 Howard Avenue, they would still not know whether the apartment he enters is the one from which Delossantos may have obtained the drugs.[13]  At most they could have conducted a Terry stop, requiring him to disclose his name and asking him a few questions.  See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County, 542 U.S. 177, 185, 187 (2004) ("A law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further.").  Any suspicion would be dispelled, however, once the agents would learn that Rodriguez lived in one of the apartments at that residence, and at that point they would have no basis to detain Rodriguez any longer.  See Florida v. Royer, 460 U.S. 491, 500 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel

---

[13]The agents would have been able to determine which apartment Rodriguez entered by following him into the building, as the common areas of hallways of an apartment building are not "public" places in which individuals have a reasonable expectation of privacy.  See U.S. v. Reed, 572 F.2d 412, 423 (2d Cir. 1978).

the officer's suspicion in a short period of time."). "[I]f a person is stopped on suspicion that he has just engaged in criminal activity, but the suspect identifies himself satisfactorily, . . . there is no basis for further detention, and the suspect must be released." 4 LaFave, Search and Seizure § 9.2(f), at 335.

Of course, if Delossantos confessed, approximately twenty-five minutes after his arrest, that the drugs were at 1315 Howard Avenue and that Rodriguez was involved, the agents would have had probable cause to arrest Rodriguez. However, on the record before the court, the court cannot conclude that the government has proven by a preponderance of the evidence that would have happened before Rodriguez returned to 1315 Howard Avenue and rightfully entered his apartment to destroy the drugs.

The government argues that the court is not permitted to "speculate" about such a course of action and that such speculation "should not dictate the results of the inevitable discovery analysis." U.S. Suppl. Mem. at 10.[14] However, the inevitable discovery doctrine "'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred.'" Cabassa, 62 F.3d at 473 (citations omitted). While the court does not view such determinations as "speculation," it must, based on the

---

[14]The government mistakenly relies on U.S. v. Arms, 2002 WL 32781 (E.D.N.Y. 2002). In that case, the court held that there was "nothing to suggest" that the evidence would have been removed prior to the search. Id. at *5. Its decision was based on the fact that the initial unlawful entry had taken place past midnight and five hours after the car was stopped and one of the occupants had gotten away; thus "if that person intended to warn Arms, he would have already done so and Arms undoubtedly would have acted immediately. There is nothing here to suggest that during the night, while Arms was at home in bed, the several firearms, bags of marijuana and crack cocaine, and rolls of cash, would have been removed before the morning." Id. In the instant case, once Rodriguez knew of Delossantos' arrest, there *is* "something" here to suggest that Rodriguez would have returned to his apartment and "acted immediately."

record before it, make a judgment of what would have happened.  The government has the burden of persuading the court what it claims would have happened, that would have led to lawful discovery of the evidence.  Indeed, the burden is on the government to provide the court, with a "high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."  Heath, 455 F.3d at 60 (Part III).  The court finds that the government has failed in its burden of proving that Delossantos would have made the same statements absent Rodriguez's arrest and the police telling Delossantos that agents were on their way to search the apartment.  Indeed, to base the inevitable discovery of the drugs on Delossantos' confession "requires engaging in precisely the type of speculation the Court proscribed in Nix."  De Reyes, 149 F.3d at 196.  Even if the government were to have met its burden with regard to that contingency, the court finds that, while the agents would have eventually obtained probable cause to search the apartment and to arrest Rodriguez, the government has not shown that it would have obtained that probable cause at a time when the drugs were still in the apartment.

One additional issue to address involves the government's reliance on its obtaining a search warrant immediately after Delossantos confessed to the police.  The Second Circuit requires more than a showing of probable cause for the inevitable discovery doctrine to apply: it also requires courts to look at the extent of completion of the warrant process at the time of the illegal search.  See Cabassa, 62 F.3d at 473. The government asserts that, although it had not yet applied for a warrant, it would have done so as part of the "procedure of an effective investigation."  See Tr. at 133. Indeed, even prior to Delossantos' arrest, the agents had planned to obtain consent or

28

a warrant to search 1315 Howard Avenue, see id. at 100-03, and that they would have done so is supported by the DEA agents' testimony regarding their routine practices and their continued surveillance of the Howard Avenue residence after the arrest with the expectation to search the apartment pursuant to a warrant or valid consent.  See Tr. at 102-103, 133; Def.'s Suppl. Mem. at 8-9.  However, there is nothing in the record to suggest they had commenced the process of securing a warrant.

In Cabassa, 62 F.3d at 474, the police had begun the warrant process, although the application was not yet completed at the time of the illegal search.  Yet still the Second Circuit refused to apply the inevitable discovery doctrine, explaining that "no one can say with any certainty how much time would have been taken to complete the application, to submit it to the magistrate judge for consideration, and to secure the warrant's issuance."  Id.  However, in that case the government's showing of probable cause was also "not 'overwhelming,'" and thus the court's holding was based on the combination of these two factors.  Id. at 473 (citations omitted).  If the court assumes for the purposes of this motion that, as a result of Delossantos' confession the police would have obtained probable cause both to arrest Rodriguez and to search an apartment at 1315 Howard Avenue, there remains the fact that there is no evidence that the agents had already begun the process of obtaining a search warrant, making application of the inevitable discovery doctrine less appropriate.[15]  Compare id. ("If the process . . . has barely begun . . . the inevitability of discovery is lessened by the

---

[15]The government again mistakenly relies on Arms, 2002 WL 32781 (E.D.N.Y. 2002).  In that case, government agents had in fact obtained a warrant, although for the wrong apartment. The court held that, absent the mistake on the part of one of the agents regarding which apartment he observed the driver of a car enter, "the original warrant would have issued, based on probable cause, for the proper address."  Id. at *5.

probability, under all the circumstances of the case, that the evidence in question would no longer have been at the location of the illegal search when the warrant actually issued."), with United States v. Whitehorn, 829 F.2d 1225, 1231 (2d Cir.1987) (inevitable discovery doctrine appropriate where agents had begun the process for obtaining a warrant over an hour before the illegal search and there was "overwhelming" probable cause).

Because the court cannot find that the government has proven by a preponderance of the evidence that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor, the court concludes it was obtained illegally.


V.    **CONCLUSION**

For the foregoing reasons, the court GRANTS the defendant's Motion to Suppress [**Doc. No. 46**].

**SO ORDERED.**


Dated at Bridgeport, Connecticut this 4th day of October, 2006.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge